**IN THE UNITED STATE$S DISTRICT
COURT FOR THE DISTRICT OF
COLORADO**

Civil Action No.:

**CONNEXION ASSET GROUP, LLC,** a Colorado limited liability company,

     Plaintiffs,

v.

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA**, a Connecticut
corporation,

     Defendant.

---

### COMPLAINT AND JURY DEMAND

---

     COMES NOW Plaintiff Connexion Asset Group, LLC ("Plaintiff"), by and through
its attorneys, Furtado Law PC, for its Complaint against the above-named Defendant
Travelers Property Casualty Company of America, and states as follows:

### I.     NATURE OF THE ACTION

1. Plaintiff brings this action seeking economic and non-economic damages related to
   Defendant's breach of an insurance contract and statutory claims pursuant to C.R.S.
   §§10-3-1115 and 10-3-1116 arising from Defendant's unreasonable delay and denial
   of covered insurance benefits including recoverable depreciation.

### II.     PARTIES

2. Connexion Asset Group, LLC ("Plaintiff") is a Colorado limited liability company with
   its principal place of business at 1440 Blake Street, Suite 320, Denver, CO 80202.
   The sole member of Plaintiff is AMDC Holdings, LLC. AMDC Holdings, LLC is a

Colorado limited liability company with its principal place of business 1440 Blake Street, Suite 320, Denver, CO 80202. The members of AMDC Holdings, LLC are 1) the Edwin G. Anderson 2007 Irrevocable Trust, 2) the Edwin G. Anderson III Legacy Trust and 3) Edwin G. Anderson. All three members are domiciled in Colorado.

3. Travelers Property Casualty Company of America ("Defendant") is a Connecticut corporation with its principal place of business located in Hartford, CT and is authorized to do business in Colorado.

### III.    JURISDICTION AND VENUE

4. Jurisdiction is asserted pursuant to 28 U.S.C. §1332 and 28 U.S.C. § 1391. The amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties. Venue is proper because Defendant's insurance policy was purchased in Colorado and was intended to provide coverage for a property located in Colorado.

### IV.    GENERAL ALLEGATIONS

5. Plaintiff sought and obtained an insurance policy, Policy No. YJ630 9A784244 (hereinafter "the Policy"), from Defendant for commercial property located at 500 West 53rd Place, Denver, CO 80216 (hereinafter "the Property").

6. On or about May 8, 2017, during the Policy period, a hailstorm hit Plaintiff's Property causing property damage.

7. On or about June 2017, Plaintiff reported the loss to Defendant and Defendant issued Plaintiff claims number D5R1061001H. Defendant also assigned Adam Newell as its local adjuster on the claim to produce an estimate of covered benefits.

8.  On or about June 13, 2017, Plaintiff hired Troon Companies ("Troon") at its general contractor on the claim.

9.  On or about August 30, 2017, Mr. Newell retained Case Forensics as its engineer on the claim to investigate the loss. Upon information and belief, Case Forensic is known in the industry as an insurance defense engineering firm that primarily provides engineering analysis to insurers regarding insurance claims.

10. On or about September 20, 2017, Case Forensics' engineer Stephen Mack inspected the Property for hail damage from the date of loss. Upon information and belief, Mr. Mack's report is flawed, and Defendant has no basis to rely upon in determining coverage because Mr. Mack's report relies upon a distinction regarding damage not applicable in Plaintiff's insurance Policy. More specifically, Mr. Mack's report analyzed whether the roof sustained functional vs. cosmetic hail damage even though the Policy covers both. Mr. Mack did not report the extent of cosmetic damage or repair methodologies related to this type of damage.

11. Mr. Mack's report also defined functional damage (roofing materials) as, "the reduction in the water shedding capacity and/or the expected service life of the membrane." His report also defined functional damage (other components) as, "the diminished capacity to perform the intended function of the component or the reduction in the useful service life of the component."

12. Upon information and belief, the above definitions are not industry standard or widely accepted scientific principles to be applied in engineering inspections for hail damage in Colorado.

13. Upon information and belief, Mr. Mack is not qualified to determine how hail damage effects the service life of a component substrate or roofing material/ component.

14. Upon information and belief, Mr. Mack's report concluded that the metal parapet caps, HVAC enclosures and roof appurtenances were hail damaged. However, he concluded that any such indentations were cosmetic in nature and not functional damage.

15. Upon information and belief, Mr. Mack also found that there were hail indentations on the condenser fins on the west and south facing surfaces of HVAC units. However, due to his assessment of the hail splatter mark direction, he determined that such damage was not from the May 8, 2017 hailstorm.

16. Upon information and belief, the determination of the direction of hail is a topic that only qualified meteorologist can opine on. Upon information and belief, Mr. Mack is not qualified to determine the direction of hail from splatter marks.

17. He also determined that hail punctures existed on the west-facing parapet base flashings and this damage was functional in nature and from the date of loss damages based upon the appearance of the damage.

18. He also determined that the metal panel dents on the building elevations were cosmetic in nature only without proper analysis of this determination.

19. Upon information and belief, Mr. Mack's report relied upon weather data from SPC storm reports showing hail size of 1-inch diameter. Upon information and belief, Mr. Mack's reliance on this weather reporting surface is improper. Upon information and belief, Mr. Mack's conclusion that the roof was not hail damaged from the date of loss is based upon his hail reporting service data.

20. Based upon his observations, Mr. Mack concluded the following for Defendant's review:

      a. The BUR membrane was not damaged from hail because there was no

visible evidence of bruising in the membrane and weather data.

    b. Hailstones from the date of loss did damage the parapet walls.

    c. Damage to the HVAC condenser fins, dented metal parapet caps, roof appurtenances and metal surfaces of the HVAC enclosure were cosmetic in nature only.

21. Upon information and belief, damage to HVAC condenser fins is always functional in nature and limits the serviceability of the units.

22. Upon information and belief, Plaintiff's Policy makes no distinction between cosmetic and functional damage.

23. On or about January 2018, Troon retained Solutions Before Solutions After, Inc. ("SBSA") to provide a counter-engineering report to Mr. Mack's report.

24. On or about January 18, 2018, Craig Dixon with SBSA inspected the Property to determine covered damages from the date of loss.

25. On or about February 20, 2018, Mr. Dixon drafted his work in progress report for Troon that determined that that hail damage was not visually accessible on the roof in exposed areas absent destructive testing to confirm. He only found visual hail damage at two repaired roofing areas and recommended replacement of those sections as the only reasonable repair methodology available.

26. Regarding his response to Mr. Mack, Mr. Dixon disagreed that a visual inspection of the BUR roof could determine with scientific reliability that no hail damage occurred on the roof. He could not rule out that hail damage did not occur from the date of loss.

27. Furthermore, Mr. Dixon criticized Mr. Mack's assumption that only 2.5-inch hail can damage a BUR roofing membrane. This assumption is based upon a study that is merely a hypothesis and is not scientifically sound generally.

28. Finally, Mr. Dixon recommended replacement of the base flashings that was damaged by hail.

29. Upon information and belief, Plaintiff timely submitted this report to Defendant for review.

30. On or about March 2018, Defendant re-engaged Mr. Mack to evaluate the roof based upon Mr. Dixon's report.

31. On or about March 19, 2018, Mr. Mack drafted a responsive report with the following conclusions:

   a. He criticized Mr. Smoot's failure to discern old vs. new damage related to the darkening of asphaltic components in areas of circular granular loss. Mr. Mack did not believe this type of damage occurred on the north and south facing base flashings.

   b. He misinterpreted that Mr. Smoot failed to identify hail damage on the field of the roof even though Mr. Smoot stated that he could not rule it out without further destructive testing.

   c. He stated that Mr. Smoot's report did not identify any new information on which he would change his opinion at the time.

32. Upon information and belief, Mr. Mack's supplemental report failed to identify the need for destructive testing on the roof that would confirm the existence of hail damage on the roof. Upon information and belief, Mr. Mack's supplemental report is the result of confirmation bias. Mr. Mack did not analyze the need for destructive testing because he was confident in his previous assessment.

33. Upon information and belief, Defendant has no reasonable basis to rely upon Mr. Mack's supplemental report because he made no effort to rule out hail damage on the roof and that was clear in Mr. Smoot's report as necessary to confirm damage on the roof.

34. On or about April 19, 2018, Mr. Newell re-inspected the Property and drafted a

6

supplemental estimate with a replacement cost value of $80,574.49 ($34,093.50 ACV).

35. Upon information and belief, Mr. Newell's second inspection failed to account for proper repair methodology on the roof and failed to consider the need for destructive testing to confirm Mr. Mack's findings.

36. On or about August 3, 2018, Plaintiff retained David Ford with Adjusters International Matrix Business Consulting as its public adjuster on the claim.

37. On or about August 3, 2018, Mr. Ford sent his letter of representation to Defendant.

38. On or about August 9, 2018, Defendant's adjuster Adam Newell emailed Mr. Ford that the parties were trying to schedule a re-inspection.

39. On or about August 15, 2018, Mr. Ford informed Mr. Newell that he had retained a company to perform an infrared scan of the roof to show water intrusion and cold spots.

40. Mr. Newell responded and requested the results of Plaintiff's destructive testing for review.

41. On or about August 29, 2018, Mr. Ford emailed Mr. Newell that he intended to perform core sample destructive testing on the roof and requested Mr. Newell's availability.

42. On or about January 9, 2019, Mr. Ford provided Mr. Newell with an update that claim went stale for a few months due to an error in communications between Troon and SBSA in doing follow-up inspections. Mr. Ford explained that Mr. Smoot's initial report was not a complete report and he intended to supplement the report with further testing and analysis by SBSA soon.

43. On or about January 17, 2019, SBSA conducted a core sample on the roof.

44. On or about February 7, 2019, Heidi Klein with SBSA drafted a supplemental report on the claim.

45. In the memorandum, Ms. Klein stated that SBSA conducted core sample locations based upon the FLIR roof inspection report dated August 23, 2018. Based upon these cores, Ms. Klein concluded that there was water present in several of the cores. However, she also indicated that the core samples with water saturation were taken near known hail damage areas included patched areas and base flashing. Additionally, SBSA did not find water hail damage on the surface of the BUR roof where membrane samples were taken. However, again, she concluded that SBSA would not rule out hail damage unless and until the samples were microscopically analyzed and desaturated to look for damage in the reinforcing layers.

46. She also noted that hail damage to HVAC units was in fact hail damage and not just cosmetic in nature.

47. Finally, she recommended that all sample locations for the roof where water saturation is present be removed and replaced to return the roof to pre-loss condition.

48. Upon information and belief, Plaintiff timely submitted this report and core sample information to Defendant for consideration.

Case 1:20-cv-00091-LTB   Document 1   Filed 01/11/20   USDC Colorado   Page 9 of 15

49. On or about March 18, 2019, Mr. Ford withdrew from representation on the claim.

50. On or about March 31, 2019, Plaintiff invoked appraisal under the policy and named Rocky Mountain Adjusters as its appraiser on the claim.

51. On or about April 1, 2019 Plaintiff retained counsel to seek a tolling agreement with Defendant.

52. On or about April 2019, Plaintiff's public adjuster Pivot Adjusters retained Draper Consulting, LLC to prevent an engineering analysis of the hail damage to Plaintiff's hvac units.

53. On or about April 23, 2019, Mr. Draper produced his expert report with the following findings:

   a. Units RTU-1 through 10 have enhanced hail damage on the coil fins.

   b. The coating on the condenser coil of RTU-10 has been removed by hail.

   c. The units have various other condenser coil fin damage.

   d. The top cabinet panels of rooftop units RTU-1 through 4 and 6 through 10 have circular dents consistent with hail damage.

   e. Exhaust fans for RTU-1 through 10 have circular dents consistent with hail damage.

   f. The hoods of H1 and H2 have circular dents consistent with hail damage.

   g. 136 vent caps on the roof have circular dents consistent with hail damage.

54. Upon information and belief, Mr. Draper's report was timely submitted to Defendant and Defendant has yet to adjust the claim based upon this report or SBSA new report information.

55. On or about May 8, 2019, the parties executed a tolling agreement of all claims through May 8, 2020.

56. On or about May 2019, Plaintiff also retained Gregory Becker with Becker Engineering to evaluate the loss and determine causation.

57. On or about May 2, 2019, Rocky Mountain Adjusters drafted an estimate for the Property with a replacement cost value of $1,905,026.35. This estimate included a full roof replacement.

58. On or about May 14, 2019, Mr. Becker produced his written report of findings as follows:

    a. Mr. Becker found hail impacts on the roof membrane throughout the entire surface with less gravel ballast. He determined that the hail size was sufficient to cause the damage observed. He also noted that CORE Forensics core samples also showed hail damage in 2 of the three samples taken.

    b. He also agreed that there was hail damage to the metal mansard roof, HVAC units, metal roof vent caps, coping and overhead doors. He also found hail damage on the window screens and mortar window beads.

    c. He also found damage on the tilt wall topcoat that exposed it to future damage.

    d. He also noted that interior leaks correlated with the date of loss hail damage.

59. Regarding repairs, Mr. Becker also noted that it was not recommended to attempt patching or coating on the roof membrane because such a repair would not provide an adequate seal(bond) between coatings and the old roofing.

60. He also noted that hidden problems including decking issues could only be addressed if the entire roof was removed and replaced. Therefore, he recommended a full roof replacement to address the entirety of hail damage he noted on the roof.

61. He also properly classified all other damage to metal surfaces on the roof as

functional damage even though Defendant's engineer attempted to differentiate such damage as cosmetic vs. functional damage.

62. Upon information and belief, while Plaintiff timely disclosed this report to Defendant, Defendant has yet to readjust the claim with this new information.

63. On or about May 22, 2019, Defendant agreed to proceed to appraisal and named Brian Beatty with J.S. Held as its appraiser.

64. On or about June 2019, Plaintiff retained Genesis Weather Solutions, LLC as its meteorologist on the claim to provide a proper weather analysis of the hail size and direction and speed for the date of loss hail damage.

65. On or about June 7, 2019, Bryan Rappolt with Genesis provided his report that concluded that the hail size on May 8, 2017 at the Property ranged from 1.5 inch to 2.25-inch hail. He also concluded the hail was dense and composed of solid ice. He also determined that the wind speed was 38-41 mph at the time of the loss.

66. Upon information and belief, this report was timely disclosed to Defendant and Defendant has yet to respond to the report.

67. Upon information and belief, Defendant's non-response, even in the midst of negotiating appraisal guidelines, is evidence of bad faith and in violation of Colorado's Unfair and Deceptive Trade Practices Act.

68. Upon information and belief, instead of proceeding directly to appraisal, Defendant suggested mediation to resolve the parties dispute.

69. On or about October 2019, the parties proceed to mediation and were unable to resolve the dispute.

70. Upon information and belief, subsequent to this mediation, Plaintiff demanded appraisal a second time and Defendant has yet to respond to this demand.

71. Although Defendant had the necessary documentation during the claim process to identify the proper scope of repairs and price for Plaintiff's claim, Defendant unreasonably delayed and denied covered benefits by failing to properly pay for covered benefits.

72. As a consequence of Defendant's conduct in unreasonably delaying and denying Plaintiff's claims for benefits due and owing under the Policy, Plaintiff has incurred and continues to incur damages.

## V. FIRST CLAIM FOR RELIEF
### (*Breach of Contract*)

73. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein.

74. The Policy creates a contract of insurance.

75. By its actions, as described above, Defendant breached the contract of insurance by failing to consider all relevant information submitted by Plaintiff on the claim and failing to pay covered benefits under the Policy.

76. As a direct and proximate result of said breach, the Plaintiff is entitled to damages in an amount to be determined at trial.

## VI. SECOND CLAIM FOR RELIEF
### (*Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116*)

77. Plaintiff incorporates the allegations contained in the paragraphs above as if fully set forth herein

78. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

79. Plaintiff is a first-party claimant under C.R.S. §10-3-1115.

80. Defendant has denied Plaintiff's claim without a reasonable basis within the meaning

of C.R.S. §10-3-1115.

80.  C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

81. Because Defendant's actions, as described above, violate C.R.S. §10-3-1115, Plaintiff brings this claim to recover its reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. §10-3-1116.

### THIRD CLAIM FOR RELIEF
*(Declaratory Judgment)*

82. The allegations contained in Paragraphs 1 through 81 set forth above are hereby incorporated.

83. The parties currently agree that appraisal is appropriate for this matter to determine the amount of the loss, but Defendant has disputed the scope of appraisal and whether appraisal can determine causation.

84. An actual controversy exists regarding the contours of the appraisal process and if appraisers can in Colorado determine causation.

85. While there are several cases on point in this District, Defendant continues to assert that causation is not part of the appraisal process.

86. Plaintiff seeks declaratory judgment that the Court align with other courts in jurisdiction and declaratory its rights under the Policy that the Policy does in fact allow for causation to be determined in appraisal and allow the appraisal panel to determine the scope of the appraisal.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks that this Court enter judgment in its favor and against Defendant on its Claims for Relief as follows:

1.   All unpaid covered benefits owed under the Policy;

2.   Declaratory judgement relief;

3.   Two times the amount of all covered benefits under the Policy;

4.   Costs, expert witness fees, and attorneys' fees per statute incurred in prosecuting its claims;

5.   Pre- and post-judgment interest; and

6.   For such other and further relief as this Court may deem just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS**

Respectfully submitted this 11th day of January 2020.

FURTADO LAW PC

*/s/ Nathanael Archuleta*
David Furtado, Esq.
Matthew Berman, Esq.
Nathanael Archuleta, Esq.
Furtado Law PC
3773 Cherry Creek North Drive,
Ste. 755
Denver, CO 80209
Telephone: (303) 755-2929
Email:         Dfurtado@furtadolaw.com
               Mberman@furtadolaw.com
               nathanael@furtadolaw.com

14

Attorneys for Plaintiff